UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

KRISTINE YODER,

      **Plaintiff,**

      v.
                                Case Number 2:23-cv-3967
                                Judge Edmund A. Sargus, Jr.
                                Magistrate Judge Elizabeth P. Deavers

OHIO STATE UNIVERSITY,

      **Defendant.**

## OPINION AND ORDER

This matter is before the Court on Defendant Ohio State University's ("OSU") Motion

for Summary Judgment. (ECF No. 40.) Plaintiff Dr. Kristine Yoder filed a response in opposition

(ECF No. 44) and OSU filed a reply (ECF No. 45). For the reasons stated below, OSU's Motion

for Summary Judgment is **GRANTED**.

## BACKGROUND

Dr. Yoder is an Associate Professor in the Cancer Biology and Genetics Department at

OSU's College of Medicine. (ECF No. 1.) She is suing OSU under Title VII of the Civil Rights

Act of 1964, 42 U.S.C. §§ 2000e, *et seq.*, and the Equal Pay Act, 29 U.S.C. § 206(d). (*See id.*)

She alleges that she has "been subjected to demeaning comments, [a] hostile work environment,

a substantially lower salary than her male colleagues, and retaliation." (*Id.*)

### I.      Factual Background

Dr. Yoder received her Ph.D. in biology in 2000 and was hired by OSU in 2004 as a

postdoctoral researcher. (Yoder Dep., ECF No. 39, 19:7–10; 23:9–14.) In 2012, she was

promoted to Assistant Professor and in 2020, she was promoted to Associate Professor. (*Id.*

34:13–16; 37:9–15.) In 2018, as an Assistant Professor, she received an off-cycle salary increase

from $109,000 to $130,000. (*Id.*, Ex. E, PageID 1632; Tsichlis Dep., ECF No. 36, Ex. 3, PageID 902.) According to Dr. Yoder, this increase was due to recognition that her salary was "inappropriately low." (Yoder Dep., 45:15–17.) She also received on-cycle merit increases as part of her annual reviews. (Yoder Dep., 195:4–7.) In May 2025, Dr. Yoder's annual salary was approximately $188,800. (Toland Dec., ECF No. 41, PageID 1868.)

During the relevant time period in this lawsuit, the Chair of the Cancer Biology and Genetics Department was Dr. Philip Tsichlis. (Tsichlis Dep., 13:2–3.) Dr. Amanda Toland was Vice Chair of the Department. (Toland Dep., ECF No. 35, 24:1.) Dr. Tsichlis resigned from the position in March 2024, and Dr. Toland became interim chair. (Tsichlis Dep., 13:8–16; Toland Dep., 9:17–10:2.) Dr. Tsichlis still works at OSU as a professor of cancer biology and genetics. (Tsichlis Dep., 12:21–13:1.)

While working at OSU, Dr. Yoder was in a long-term relationship with an OSU faculty member, Dr. Richard Fishel, that ended in 2024. (Yoder Dep., 16:5–13.) In March 2020, Dr. Fishel had a falling out with Dr. Tsichlis, the former chair of the department, related to a grant application. (*Id.* 99:6–15.) According to Dr. Yoder, Dr. Tsichlis retaliated against Dr. Fishel by actively obstructing a retention package that Dr. Fishel was negotiating with OSU's Cancer Center. (*Id.* Ex. V, PageID 1774.)

Dr. Yoder states that she had a falling out with Dr. Tsichlis after he was disrespectful to her in an email exchange about a COVID-19 lab reopening plan in May 2020. (*Id.* 99:17–24.) In the email, he told her that "complaining is not helpful" after she expressed concern about a one-day notice period to draft a lab reopening plan during the COVID-19 shutdown. (*Id.* 104:12–105:14; Ex. J, PageID 1680.) Dr. Yoder also alleges that Dr. Tsichlis interrupted her three times at a faculty meeting and had previously interrupted another female staff member in meetings. (*Id.*

2

113:18–114–7; 115:2–23.) She says that she never observed Dr. Tsichlis interrupting male faculty members. (*Id.* 116:8–11.) Dr. Yoder also asserts that Dr. Tsichlis made it difficult for her to hire a Research Assistant Professor. (*Id.* 210:5–8.) Although the candidate was eventually hired, Dr. Yoder thought that Dr. Tsichlis "held up" the process. (*Id.* 159:14–18.) But shortly after, a male colleague had no difficulty hiring a Research Assistant Professor. (*Id.* 210:9–212:23.) Dr. Yoder raised her concerns about Dr. Tsichlis to department leadership but felt that she "was not being heard." (*Id.* 119:20–21; 121:3–4; Ex. L, PageID 1692–94; Ex. M, PageID 1697–1701.)

Dr. Yoder states that when she was promoted to Associate Professor, she did not receive the full promotion raise that she was promised so she began looking into her salary. (*Id.* 50:5–11.) She discovered that a male Associate Professor, Dr. Vincenzo Coppola, was making "much more [than her] even though [she] was outperforming him in every metric." (*Id.* 50:16–20.) In October 2020, Dr. Yoder filed a complaint with OSU human resources about her salary, citing that she earned $159,000 per year but Dr. Coppola, "a male colleague at the same career stage," earned around $220,000 per year even though she outperformed him. (*Id.*, Ex. O, PageID 1710–11.)

In November 2020, Dr. Yoder filed a second complaint about Dr. Tsichlis, this time to OSU human resources. The complaint stated:

> As you know I recently contacted [OSU] about the gender based disparity between the salaries of me and my male colleague. I am filing this complaint now because I believe Tsichlis will undermine me in this dispute. I am seeking HR protection from further retaliation by Tsichlis against me and my significant other.

(*Id.*, Ex. U, PageID 1769; *see also* Ex. V, PageID 1772–75.)

Shortly after, Dr. Coppola invited Dr. Yoder to speak at a department seminar. (*Id.* 130:22–131:1.) The following email conversation ensued:

3

> Dr. Yoder: I have an on-going dispute with OSU and will not present until it is resolved.
> Dr. Coppola: OK Kristine, thanks. I hope you resolve your dispute soon.
> Dr. Tsichlis: Life is full of struggles! I hope that she resolves her dispute too.

(*Id.* Ex. P, PageID 1713–14.) Dr. Yoder found Dr. Tsichlis's email to be dismissive and was offended by it. (*Id.* 131:5–18.)

In January 2021, Dr. Yoder filed a formal salary review request to Dr. Tsichlis, per OSU policy, requesting an increase to $250,000 per year. (*Id.*, Ex. BB, PageID 1621–22.) Dr. Tsichlis denied the request, stating:

> [Y]our salary does not meet the standards for eligibility for review as it does not rank 5% below the average salary within the department. Your current salary is higher than the mean faculty salary for members in the department of Cancer Biology and Genetics at an equivalent rank.

(*Id.*, Ex. CC, PageID 1627.) Dr. Yoder appealed the decision to the College of Medicine, but the appeal was denied for the same reasons. (*Id.*, Ex. EE, PageID 1633.)

Regarding Dr. Coppola's salary, OSU asserts that Dr. Coppola earned more than Dr. Yoder because he earned a base salary of $90,000 plus an additional $75,000 administrative supplement for his role as Director of the Genetically Engineered Mouse Modeling Core ("Mouse Core"). (Mot., PageID 1838, 1844; Yoder Dep., Ex. G, PageID 1661.) Dr. Coppola's additional role ended in 2022, and his salary was reduced from $220,000 to $165,000. (Coppola Dep., ECF No. 37, 38:5–39:7.) As of May 2025, Dr. Coppola earned $20,000 *less* than Dr. Yoder. (Toland Dec., PageID 1868–89.)

Dr. Yoder alleges that she experienced retaliation after her workplace complaints. In Dr. Yoder's 2021 annual performance review, Dr. Tsichlis gave her a score of "good." (Yoder Dep., 193:3–10; Ex. RR, PageID 1739.) Dr. Yoder voiced disagreement with the score, and it was subsequently changed to "great," the highest possible score, without comment. (*Id.* 194:3–15; Ex. SS, PageID 1753.) Even so, she received a 4% increase that year, while a junior male

4

professor received a 5% increase. (Toland Dec., PageID 1869–70.) According to OSU, this was because Dr. Yoder did not participate in any "departmental service" that year and her publications did not meet certain expectations, whereas the male professor satisfied both metrics. (*Id.* PageID 1870–71.)

In March 2021, Dr. Fishel was admonished by OSU for sending antagonistic emails to faculty and staff members. (*Id.*, Ex. HH, PageID 1670.) As part of the admonishment, OSU intended to move Dr. Fishel's laboratory to a different location on campus. (*Id.*) Because Dr. Yoder shared a laboratory with Dr. Fishel, Dr. Yoder states that this would have negatively impacted her research because she and Dr. Fishel shared equipment. (*Id.* 95:10–96:2.) Dr. Fishel's lab was never moved. (*Id.* 97:24–98:1.) Dr. Yoder characterizes this as retaliation "not necessarily against [her,] but against Dr. Fishel." (*Id.*)

In May 2021, Dr. Yoder filed a third complaint to OSU human resources about Dr. Tsichlis, stating that the retaliation against her and Dr. Fishel was escalating. (*Id.*, Ex. OO, PageID 1712; Ex. PP, PageID 1715.) A few days later, human resources responded to Dr. Yoder addressing her concerns. (*Id.*, Ex. QQ, PageID 1729.) The response stated that "Dr. Tsichlis's communication was not in alignment with [OSU] values and he was provided feedback related to our expectations of communication moving forward." (*Id.*) The email also stated that the Office of Institutional Equity would be contacting Dr. Yoder about her retaliation allegations. (*Id.*)

## II.     Procedural Background

Before filing this lawsuit, Dr. Yoder filed a discrimination charge with the United States Equal Employment Opportunity Commission ("EEOC"). (ECF No. 1-1.) No EEOC action was taken, and the EEOC issued Dr. Yoder a right-to-sue letter in September 2023. (*Id.*) In November 2023, Dr. Yoder filed a complaint against OSU, as well as the OSU College of

Medicine, Dr. Tsichlis, and Dr Bradford, alleging Title VII sex discrimination, in violation of 42 U.S.C. § 2000e-2; a violation of the Equal Pay Act, 29 U.S.C. § 206(d)(1); the creation of a hostile work environment, in violation of 42 U.S.C. § 2000e-2; and retaliation under Title VII and the Equal Pay Act. (*See* ECF No. 1.) She requests an award of compensatory damages, attorney's fees, litigation costs, and unspecified equitable relief. (ECF No. 1.)

The Defendants filed a motion for judgment on the pleadings. (ECF No. 10.) In March 2025, the Court issued an Opinion and Order dismissing Defendants OSU College of Medicine, Dr. Tsichlis, and Dr. Bradford because they were redundant and unnecessary to Dr. Yoder's claims against OSU. (ECF No. 28.) The Court also concluded that "Dr. Yoder's claims against OSU for sex discrimination and a hostile work environment under Title VII of the Civil Rights Act of 1964, unequal pay under the Equal Pay Act, and retaliation under Title VII and the Equal Pay Act can continue." (*Id.*)

OSU then filed a Motion for Summary Judgment. (ECF No. 40.) Dr. Yoder responded in opposition (ECF No. 44) and OSU replied (ECF No. 45.)

## LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden of establishing there are no genuine issues of material fact, which it may achieve by demonstrating the non-moving party lacks evidence to support an essential element of its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co., L.P.A.*, 12 F3d 1382, 1388–89 (6th Cir. 1993). The burden then shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (quoting Fed. R. Civ. P. 56). When evaluating a

6

motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

A genuine issue of material fact exists if the non-moving party can present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morr Cos.*, 8 F.3d 335, 339–40 (6th Cir. 1993). In other words, "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (concluding that summary judgment is appropriate when the evidence could not lead the trier of fact to find for the non-moving party).

**ANALYSIS**

**I.     Sex Discrimination**

Under Title VII of the Civil Rights Act of 1964, it is unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). A plaintiff may prove a case of discrimination under Title VII by presentation of direct or circumstantial evidence. *Ondricko v. MGM Grand Detroit, LLC*, 689 F.3d 642, 649 (6th Cir. 2012). Title VII discrimination claims based on circumstantial evidence are governed by the burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Masaebi v. Arby's Corp.*, No. 2:19-CV-5271, 2020 WL 1275724, at *3 (S.D. Ohio Mar. 17, 2020).

To establish a *prima facie* case of sex discrimination, Dr. Yoder must prove that she was (1) a member of a protected class; (2) was qualified for the job; (3) suffered an adverse

employment decision; and (4) was replaced by a person outside the protected class or treated differently than similarly situated non-protected employees. *Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d 599, 606–07 (6th Cir. 2019); *Vincent v. Brewer Co.*, 514 F.3d 489, 494 (6th Cir. 2007).

"Once the plaintiff proves a *prima facie* case of discrimination, the burden shifts to the defendant to produce 'some legitimate nondiscriminatory reason for the adverse employment action.'" *Nickerson v. Potter*, 102 F. App'x 936, 937 (6th Cir. 2004) (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). If OSU establishes a nondiscriminatory reason for the adverse action, "the burden shifts back to the plaintiff to produce credible evidence that the reason offered by the defendant is a mere pretext for unlawful discrimination." *Id*. To challenge the credibility of the nondiscriminatory reason, Dr. Yoder must show that the reason (1) had no basis in fact, (2) did not actually motivate the conduct, or (3) was insufficient to motivate the conduct. *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994), *overruled on other grounds by*, *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009).

OSU disputes the last two elements of a *prima facie* sex discrimination claim—that Dr. Yoder suffered an adverse employment action and that she was treated differently than similarly situated employees. (Mot., PageID 1849.) "An adverse employment action is an action by the employer that constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Bruce v. Meharry Med. Coll.*, 692 F. App'x 275, 278 (6th Cir. 2017) (quoting *Regan v. Faurecia Auto. Seating, Inc.*, 679 F.3d 475, 481 (6th Cir. 2012)). "[A]n employer's withholding of a discretionary raise or bonus that an employee is otherwise entitled

8

to based on the terms and conditions of employment may constitute an adverse action . . . ."

*Milczak v. Gen. Motors, LLC*, 102 F.4th 772, 786 (6th Cir. 2024).

The parties focus on one[1] potential adverse employment action: Dr. Yoder's 2021 annual increase of 4% even though she received a score of "great" while a male faculty member received an increase of 5% that year. (Mot., PageID 1852; Opp., PageID 1901.) According to OSU, the 2021 percentage increase range for employees in the "excels" category was 3.25–5%. (Mot., PageID 1853; Yoder Dep., Ex. VV, PageID 1792.) And the aggregate increase for the department could not exceed 3%. (Mot., PageID 1853; Yoder Dep., Ex. VV, PageID 1792.) OSU contends that Dr. Yoder's "great" review and "excels" merit increase, which is greater than the baseline percentage of 3.25%, is not an adverse action. (Mot., PageID 1852.)

Even if it is an adverse employment action, OSU argues, there are nondiscriminatory reasons that Dr. Yoder received a 4% increase while the male faculty member received a 5% increase. (*Id.* PageID 1854–55.) Dr. Yoder did not engage in departmental service, and her publications did not meet expectations because two of her three publications were reviews of others' articles as opposed to primary research results. (*Id.*; Yoder Dep., Ex. TT, PageID 1767.) In contrast, the male faculty member engaged in departmental service and his publications were of greater scientific impact. (Mot., PageID 1854; Toland Dec., PageID 1871.)

---

[1] Dr. Yoder raises a second potential adverse action: she was not awarded a bonus for exceeding her grant funding goal. (Opp., PageID 1900.) Her opposition to OSU's Motion for Summary Judgment is the first time she advances this theory. Because "[a] non-moving party may not raise a new legal theory for the first time in response to the opposing party's summary judgment motion," the Court declines to consider Dr. Yoder's new theory. *Miller v. Donahoe*, No. 3:09-cv-460, 2012 WL 5269186, at *6 (S.D. Ohio Oct. 23, 2012) (Black, J.) (citation omitted). Further, OSU asserts that Dr. Yoder did receive a bonus in the years that she met OSU's grant-funding requirement. (ECF No. 45, PageID 1961–62.)

The Court is not convinced that Dr. Yoder has established a *prima facie* case of sex discrimination. Nevertheless, the Court need not analyze the issue because, assuming Dr. Yoder did establish a *prima facie* case, OSU has met its burden of articulating a legitimate nondiscriminatory reason for her less-than-5% increase, as outlined above.

The burden then shifts to Dr. Yoder to establish that OSU's reasons are pretextual. Dr. Yoder argues that the reasons articulated by OSU have no basis in fact and are insufficient to motivate OSU's conduct. (Opp., PageID 1901.) She cites a letter summarizing her accomplishments for academic year 2020–2021, which states that she "[has] strong service at the university and national level" and "met or exceed[ed] expectations for individuals at the Associate Professor rank in all areas (scholarly work, teaching, and service)." (*Id.*) (citing Yoder Dep., Ex. TT, PageID 1767–68).) But the letter also states the reasons that OSU cites for her less-than-5% increase: she did not "perform any departmental service" and "[t]wo of three articles were reviews." (Yoder Dep., Ex. TT, PageID 1767.) Dr. Yoder does not explain how OSU's reasons for the less-than-5% increase have no basis in fact or are insufficient. Rather, the letter that she cites demonstrates that merit increases are based on a comprehensive evaluation of a multitude factors. (*See* Toland Dep., 12:2–15:24.) Thus, Dr. Yoder does not establish that OSU's reasons for the lower pay increase are pretextual.

OSU has established that there is no genuine issue of material fact as to Dr. Yoder's Title VII sex discrimination claim. Accordingly, OSU's Motion for Summary Judgment on the sex discrimination claim is **GRANTED**.

## II.     Equal Pay Act

The Equal Pay Act prohibits employers from paying employees different wages for the same work on the basis of sex. 29 U.S.C. § 206(d)(1). Equal Pay Act claims follow a similar burden-shifting framework as Title VII claims. *See Schleicher v. Preferred Solutions, Inc.*, 831 F.3d 746, 752–53 (6th Cir. 2016). First, a plaintiff must make a *prima facie* showing that (1) the employer paid different wages to male and female employees (2) for substantially equal work. *Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974). If the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to prove that the wage differential is justified under one of the four affirmative defenses set forth under 29 U.S.C. § 206(d)(1): (1) a seniority system; (2) a merit system; (3) a system which measures earnings by quantity or quality of production; or (4) any other factor other than sex. *Schleicher*, 831 F.3d at 752–53. If the defendant satisfies its burden, the plaintiff "must come forward with evidence demonstrating the existence of a triable issue of fact" regarding pretext. *Id.* at 753.

For her Equal Pay Act claim, Dr. Yoder presents Dr. Coppola as a comparator. Dr. Yoder and Dr. Coppola were hired at OSU and promoted around the same time. (ECF No. 1, ¶ 21; Yoder Dep., 41:18–22.) Dr. Yoder asserts that Dr. Coppola consistently underperformed in grant funding and publications compared to her, but until 2023, he earned more than she did. (Opp., PageID 1891–94.) At the time of Dr. Yoder's pay discrepancy complaint to OSU human resources, Dr. Yoder's salary was $159,000 and Dr. Coppola's salary was $220,000. (*Id.*, Ex. O, PageID 1710–11.)

OSU asserts that Dr. Yoder cannot establish a *prima facie* case of an Equal Pay Act violation because Dr. Yoder and Dr. Coppola did not have substantially equal jobs. (Mot., PageID 1856–57.) OSU contends that in addition to his Associate Professor role, Dr. Coppola

11

was the Director of the Mouse Core until the program ended in December 2022. (*Id.* PageID 1844; Coppola Dep., 38:14–17.) Dr. Coppola earned more than Dr. Yoder because he earned a base salary of $90,000 plus an additional $75,000 administrative supplement for his administrative role as Director. (Mot., PageID 1838, 1844; Yoder Dep., Ex. G, PageID 1661.) His salary was reduced to $165,000 after the Mouse Core program ended. (Coppola Dep., 38:5–39:7.) And as of May 2025, Dr. Coppola earned nearly $20,000 *less* than Dr. Yoder. (Mot., PageID 1844; Toland Dec., PageID 1868–89.)

Dr. Yoder argues that she and Dr. Coppola have substantially similar jobs because they received tenure around the same time, both conduct research, and are evaluated under the same performance standards. (Opp., PageID 1903.) She describes Dr. Yoder's responsibilities as Director as "infrequent" duties that took up "minimal time." (*Id.* PageID 1903–04.) Dr. Yoder also states that Dr. Coppola's administrative duties were "illusory" because they overlapped with his duties as Associate Professor. (*Id.* PageID 1904.)

The parties do not dispute whether Dr. Yoder's and Dr. Coppola's Associate Professor positions were substantially similar. The dispute centers on whether Dr. Coppola's role as Director is an additional duty that warrants additional pay. (Mot., PageID 1856–58; Opp., PageID 1903–05.) "[A]dditional duties may demonstrate that two jobs are not substantially equal." *Andrews v. Moore Elec. Serv.*, No. 4:04-CV-111, 2005 WL 3609371, at *3 (W.D. Mich. Nov. 2, 2005) (citing *Brennan v. Prince William Hosp. Corp.*, 503 F.2d 282, 285 (4th Cir. 1974)). But "[a]dditional duties may not be a defense to the payment of higher wages to one sex where the higher pay is not related to the extra duties." 29 C.F.R. § 1620.20. An employer cannot successfully assert the defense if, for example, the higher paid employee does not actually do the

12

extra work, the extra duties do not exist, or the extra task "consumes a minimal amount of time and is of peripheral importance." *Id.*

OSU has sufficiently established that Dr. Coppola was paid more because of his additional duties. Dr. Coppola's employment offer letter from OSU delineates that he was hired for two separate positions. (Yoder Dep., Ex. G, PageID 1658–62.) As Director of the Mouse Core, Dr. Coppola was "heavily involved" in establishing the program by selecting the space, arranging the space, hiring, training, conducting experiments, and updating the facility with new technology. (Coppola Dep., 16:15–17:14; 18:9–20.) Once the facility was established, his responsibilities were more administrative such as attending meetings with facility users and staff, hiring people, and engaging in networking. (*Id.* 24:20–25:22; 26:15–27:3.) Dr. Coppola testified that at times, more than 50% of his time was devoted to the Director role. (*Id.* 33:1–13.) Thus, Dr. Coppola's additional duties were not illusory and did not consume a minimal amount of time. Rather, they required him to devote a considerable amount of time to the Mouse Core.

Because Dr. Yoder's and Dr. Coppola's roles were not substantially equal while Dr. Yoder was Director of the Mouse Core, Dr. Yoder cannot establish a *prima facie* case under the Equal Pay Act. This is underscored by the fact that when the Mouse Core ended, Dr. Coppola's salary was reduced, and as of May 2025, he was earning less than Dr. Yoder.

Even if Dr. Yoder could establish a prima *facie case* of an Equal Pay Act violation, Dr. Coppola's additional duties as Director of the Mouse Core would be justified under 29 U.S.C. § 206(d)(1) as a "factor other than sex" for the reasons stated above. The burden would then shift to Dr. Yoder to establish pretext. Regarding pretext, Dr. Yoder argues that OSU still pays more out of pocket to Dr. Coppola than to her because she brings in more grant funding to cover her salary. (Opp., PageID 1905–06.) Because OSU requires professors to cover 50% of their salary

13

through grants, she states that "the true comparison is between what OSU paid to each professor out of pocket for the Associate Professor duties." (*Id.* PageID 1906.)

Although Dr. Yoder's point regarding out-of-pocket pay is notable, Dr. Yoder does not establish a genuine issue of material fact that OSU's additional-duty justification for paying Dr. Coppola more is pretextual. *See Murphy v. Ohio State Univ.*, 549 F. App'x 315, 318 (6th Cir. 2013) (explaining that after an employer has established an affirmative defense, "the employee then bears the burden of producing evidence to identify a genuine dispute as to whether the employer's proffered reason is pretextual"). The fact that Dr. Yoder covered more of her salary through grant funding than Dr. Coppola does not undermine OSU's reason that the pay differential was because of Dr. Coppola's additional duties, nor does it suggest that the reason is pretextual. *See Schleicher*, 831 F.3d at 755–56 (noting that a pay disparity may support a *prima facie* case but does not establish pretext). Thus, even if she had established a *prima facie* case, she cannot overcome OSU's reasons for the less-than-5% increase.

OSU has established that there is no genuine issue of material fact as to Dr. Yoder's Equal Pay Act claim. Accordingly, OSU's Motion for Summary Judgment on the Equal Pay Act claim is **GRANTED**.

### III.    Hostile Work Environment

A plaintiff claiming a hostile work environment based on sex must prove that

(1) she belonged to a protected group, (2) she was subject to unwelcome harassment, (3) the harassment was based on [sex], (4) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment, and (5) the defendant knew or should have known about the harassment and failed to act.

*Waldo v. Consumers Energy Co.*, 726 F.3d 802, 813–14 (6th Cir. 2013) (quoting *Williams v. CSX Transp. Co.*, 643 F.3d 502, 511 (6th Cir. 2011)).

14

Factors to consider regarding whether a work environment is sufficiently hostile to state a claim under Title VII "may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). "[T]he court must consider the totality of circumstances" and the cumulative effect of the discriminatory actions when deciding whether the alleged conduct was sufficiently severe or pervasive. *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 562 (6th Cir. 1999). "[W]hen [a court] consider[s] whether a hostile-work environment was severe or pervasive enough to violate Title VII, [the court] effectively asks whether it left an employee 'worse off respecting employment terms or conditions.'" *McNeal v. City of Blue Ash, Ohio*, 117 F.4th 887, 904 (6th Cir. 2024) (quoting *Muldrow v. City of St. Louis, Missouri*, 601 U.S. 346, 355 (2024)).

OSU asserts that, other than being female, Dr. Yoder cannot satisfy the remaining elements of a hostile work environment claim. (Mot., PageID 1861.) Importantly, Dr. Yoder does not address OSU's arguments to her hostile work environment claim thereby waiving the claim. *See Brown v. VHS of Michigan, Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013) ("[A] plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment.") (collecting cases). But the Court's analysis does not end there. The Court must review the portions of the record submitted by OSU to determine whether OSU carried its burden to show that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *See Evans v. Plummer*, 687 F. App'x 434, 446 (6th Cir. 2017) ("[A] district court cannot grant summary judgment in favor of a movant simply because the adverse party has not responded.") (quoting *Carver v. Bunch*, 946 F.2d 451, 455 (6th Cir. 1991)).

15

OSU highlights that Dr. Yoder concedes that she was not subject to any gender-based or sexual comments and argues that Dr. Yoder has established no facts showing that the actions taken against her were based on gender. (Mot., PageID 1861–62.) Although Dr. Tsichlis's emails to Dr. Yoder may have been unprofessional, there is no genuine issue of material fact that his conduct was based on sex. *See Graves v. Dayton Gastroenterology, Inc.*, 657 F. App'x 485, 489 (6th Cir. 2016) (concluding that rude behavior was not enough for a hostile work environment claim absent "any basis for inferring that . . . facially gender-neutral conduct was in fact discrimination based on gender"); *Khalaf v. Ford Motor Co.*, 973 F.3d 469, 484 (6th Cir. 2020) ("Mere disrespect or antipathy will not be actionable under the statute unless a plaintiff can prove that such was motivated by discriminatory animus."). Because OSU satisfied its burden as to the second element of a hostile work environment claim, it is unnecessary to analyze the remaining elements.

OSU has established that there is no genuine issue of material fact and it is entitled to judgment as a matter of law on Dr. Yoder's hostile work environment claim. Accordingly, OSU's Motion for Summary Judgment on the hostile work environment claim is **GRANTED**.

### IV.  Retaliation

Dr. Yoder asserts a claim for retaliation under both Title VII and the Equal Pay Act. (ECF No. 1, ¶ 64.) Federal law prohibits retaliating against employees for filing complaints of discrimination under Title VII and of unequal pay under the Equal Pay Act, 29 U.S.C. § 215(a)(3). *Briggs v. Univ. of Cincinnati*, 11 F.4th 498, 514 (6th Cir. 2021).

When a plaintiff relies on circumstantial evidence of discrimination to prove retaliation, as Dr. Yoder does here, the Court uses the *McDonnell Douglas* burden-shifting framework for both types of claims. *Id.* A plaintiff must first establish a *prima facie* case of retaliation by

16

showing "(1) she engaged in activity protected under Title VII; (2) [the defendant] knew that she exercised her protected rights; (3) an adverse employment action was subsequently taken against her; and (4) [her] protected activity was the but-for cause of the adverse employment action." *Kenney v. Aspen Techs., Inc.*, 965 F.3d 443, 448 (6th Cir. 2020) (citing *Laster v. City of Kalamazoo*, 746 F.3d 714, 730–31 (6th Cir. 2014)).

If a plaintiff establishes a *prima facie* case, "the burden of production of evidence shifts to the employer to 'articulate some legitimate, non-discriminatory reason' for its actions." *Morris v. Oldham Cnty. Fiscal Ct.*, 201 F.3d 784, 793 (6th Cir. 2000) (quoting *McDonnell Douglas*, 411 U.S. at 802). If the defendant satisfies its burden, the plaintiff "must demonstrate 'that the proffered reason was not the true reason for the employment decision.'" *Id.* (quoting *Burdine*, 450 U.S. at 256).

The parties agree that Dr. Yoder engaged in protected activity by filing her workplace complaints and formal salary review request in October 2020, November 2020, January 2021, and May 2021. (Mot., PageID 1864; Opp., PageID 1907.) And there appears to be no dispute that Dr. Yoder's less-than-5%, merit increase in the summer of 2021 is an adverse employment action for purposes of retaliation. (Mot., PageID 1864; Opp., PageID 1907.)

The parties appear to only disagree on the fourth element of Dr. Yoder's *prima facie* retaliation claim. (Mot., PageID 1865–66; Opp., PageID 1907.) OSU argues that Dr. Yoder fails to establish a causal connection between Dr. Yoder's protected activity and the merit increase. (Mot., PageID 1865–66.)

"To establish the causal connection required in the fourth prong, a plaintiff must produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken had the plaintiff not" engaged in the protected activity. *Nguyen v. City of*

17

*Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000). A plaintiff can establish a causal connection by showing a close temporal proximity between the adverse employment action and the protected activity. *Taylor v. Geithner*, 703 F.3d 328, 339 (6th Cir. 2013). "But where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality." *Wilson v. Cleveland Clinic Found.*, 579 F. App'x 392, 399–400 (6th Cir. 2014).

Dr. Yoder does not attempt to establish a causal connection through temporal proximity. (*See* Opp., PageID 1907.) Instead, she argues that her less-than-5% merit increase was retaliatory because she exceeded OSU's grant-funding requirement more than any male faculty member in the department. (*Id.*) But this argument ignores that merit increases are based on a multitude of factors, not grant funding alone. As discussed above, Dr. Yoder did not receive a full 5% merit increase in 2021 because she did not engage in departmental service, and her publications did not meet expectations because two of her three publications were reviews of others' rather than primary research results. (Yoder Dep., Ex. TT, PageID 1767; Toland Dec., PageID 1870.) The male faculty member that she identifies as a comparator received the full 5% merit increase because he satisfied both of those metrics *and* met OSU's grant-funding goal. (Toland Dec., Ex. C., PageID 1877.) Thus, Dr. Yoder has not produced evidence from which it can be inferred that she would have received a higher merit increase but for her protected activity. Accordingly, she cannot establish the fourth element of a *prima facie* retaliation claim.

OSU has established that there is no genuine issue of material fact as to Dr. Yoder's retaliation claim. Accordingly, OSU's Motion for Summary Judgment on the retaliation claim is **GRANTED**.

## CONCLUSION

For the reasons stated above, Defendant's Motion for Summary Judgment (ECF No. 40) is **GRANTED** on all of Dr. Yoder's claims. The Clerk is **DIRECTED** to enter judgment and terminate this case on the Court's docket.

**IT IS SO ORDERED.**

**3/16/2026**                                    **s/Edmund A. Sargus, Jr.**
**DATE**                                          **EDMUND A. SARGUS, JR.**
                                                  **UNITED STATES DISTRICT JUDGE**